# In the United States Court of Federal Claims

**No. 03-1417L**
**(Filed September 29, 2006)**

| | | |
|---|---|---|
| **REED and BARBARA FERRARI, husband and wife; DR. TERRY and NANCY LAURITSEN, husband and wife; JOE REYES, JR. and LUCY REYES, husband and wife; WILLIAM F. TAYLOR, an individual; and THE GRAY LIVING TRUST, Robert and Jean Gray, Trustees.** | * | **Inverse Condemnation; Constructive Taking; Petroglyph National Monument Establishment Act of 1990, Pub. L. 101-313; Restrictive Covenants; Waiver of Regulations; Summary Judgment.** |
| **Plaintiffs,** | * | |
| **v.** | * | |
| **THE UNITED STATES,** | * | |
| **Defendant.** | * | |

G. Mitchell Baker, Belsen, NM, for Plaintiffs.

William J. Shapiro, U.S. Department of Justice, Environmental and Natural Resources Division, General Litigation Section, Washington, D.C., for Defendant. Robert C. Eaton, U.S. Department of the Interior, Of Counsel.

---

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

**WILLIAMS**, Judge.

Plaintiffs, the owners of five property tracts in Albuquerque, New Mexico, brought this action for inverse condemnation alleging that their property was constructively taken as a result of

the Petroglyph National Monument Establishment Act of 1990. The Act authorized the Government to acquire some 7,160 acres of land to protect over 15,000 fragile prehistoric and historic petroglyphs and other archeological sites. Once acquired, the lands would be part of the Petroglyph National Monument. The Government has not exercised eminent domain, but has purchased 4,600 acres within the Monument and has offered to purchase Plaintiffs' properties. However, Plaintiffs refused to sell, claiming the Government's offers were too low. Plaintiffs remain the owners of these properties and are free to develop their lands if they choose.

Plaintiffs claim a taking occurred based upon the Government's unreasonably low purchase offers and its failure to exercise eminent domain. Plaintiffs also allege that the Government cannot acquire their properties due to restrictive covenants on their and neighboring properties. Alternatively, Plaintiffs argue that the Government would not abide by restrictive covenants on neighboring properties that the Government has already purchased, thus forcing the Plaintiffs to bear disproportionately higher costs of installation of utility lines.[1]

This matter comes before the Court on Defendant's Motion for Judgment on the Pleadings, or in the Alternative, Motion for Summary Judgment and Plaintiffs' Cross-Motion for Summary Judgment.[2]

By the plain language of the law establishing the Monument, the Land Protection Plan formulated by the National Park Service, and a waiver issued by the Attorney General permitting the Government to honor restrictive covenants on properties it acquired, Plaintiffs have unfettered usage of and access to their property. As such, there has been no taking of Plaintiffs' property. Accordingly, Defendant's Motion for Summary Judgment is granted.

## Factual Background[3]

On June 27, 1990, Congress passed the Petroglyph National Monument Establishment Act of 1990, Pub. L. No. 101-313, 104 Stat. 272 (1990) (Petroglyph Act), which created the boundary lines of the 5280-acre Petroglyph National Monument (Monument) in Albuquerque, New Mexico. Compl. ¶ 6. Plaintiffs each own an undeveloped tract located within the Monument. The Petroglyph Act states that the lands within the Monument contain "more than 15,000 documented and prehistoric and historic petroglyphs" and "sixty-five other archeological sites." Pub. L. No. 101-313,

---

[1] Each property contained a covenant requiring the owner to pay the cost of installation of utility lines assessed against each lot by the utility company, and this cost constitutes a lien against the property until paid.

[2] Plaintiffs opposed Defendant's motion for summary judgment on the ground that there were facts in dispute but also filed their own cross-motion for summary judgment.

[3] This background is derived from the pleadings and the exhibits accompanying the parties' motion papers.

§ 101(b),104 Stat. 272 (1990). The Monument was created in recognition of the fragility of the petroglyphs and the "urgent need to protect the cultural and natural resources of the area from urbanization and vandalism." Id. Pursuant to the terms of the Petroglyph Act, Congress mandated that the National Park Service (NPS), the City of Albuquerque, and the State of New Mexico "preserve, for the benefit and enjoyment of present and future generations, [the Monument's] cultural and natural resources, and to provide for the interpretation of and research on such resources." Id § 105, 104 Stat. at 274.

The Petroglyph Act provides for the Government's acquisition of privately-owned tracts of land located within the Monument, stating:

> The Secretary [of the Interior] is authorized to acquire lands and interests therein within the monument boundary by donation, purchase with donated or appropriated funds, exchange, or transfer from any other Federal Agency...

Pub. L. No. 101-313, § 203.

In August 1990, the NPS sent letters to owners of land inside the Monument, giving them notice of the enactment of the Petroglyph Act, and informing them of the NPS' plan to acquire private property inside the Monument. Def. Exs. 15 at DOJ163, 16 at DOJ164, 18 at DOJ170-71, 19 at DOJ186 and 20 at DOJ196-208. The NPS letters stated that the NPS intended to "seek negotiated settlement wherever possible; however, if this is not possible, eminent domain proceedings may be initiated." Def. Ex. 20 at DOJ195.

In October of 1991, Defendant published the 1991 Land Protection Plan (LPP). Compl. ¶ 72-73; Def. Ex. 2 at DOJ13-20. The LPP prioritizes the tracts of land to be acquired and sets forth the methods for acquiring those tracts of land. Id. The LPP was sent to all owners of property within the Monument. Def. Ex. 13 at DOJ161; Def. Ex. 22 at DOJ225. Plaintiffs' property tracts are all located within a section designated the Atrisco Unit. Def. Ex. 2 at DOJ0026.[4] Plaintiffs' property tracts are further described under the subheading "Middle San Antonio Arroyo to the State Park (segment maps 104, 105, 106)", or as being located in the Volcano Cliffs subdivision. Def. Ex. 2 at DOJ0031-32; Def. Ex. 9; Def Mem. in Resp. to Pl. Oral Mot. to Compel, Ex. A (Def. Ex. A). Under the prioritization system established by the LPP for the acquisition of land within the Monument, Plaintiffs' property tracts are designated "priority 4", which means that the tracts are:

> Lands with comparatively low resource values that are needed to protect the integrity of the monument as a whole, with preference

[4] The LPP lists Plaintiffs' properties in Appendix B, titled "Tract Listings: Atrisco Unit". See Def. Ex. 2 at DOJ067 (105-14 Ferrari Plaintiffs' tract), DOJ068 (106-04 Reyes Plaintiffs' tract), DOJ068 (106-06 Lauritsen Plaintiffs' tract), DOJ065 (104-07 Gray Trust Plaintiffs' tract and DOJ067 (105-02 Taylor Plaintiff's tract).

> given to those lands that contain petroglyphs, are needed to protect or provide access to petroglyphs, and/or are threatened by development.

Def. Ex. 2 at DOJ049. Tracts with a "priority" designation are the lowest priority for acquisition by the NPS. Id.

Plaintiffs' property tracts were undeveloped at the time the Petroglyph Act was enacted, at the time the LPP was published, and have remained undeveloped to the present day. Def. Ex. 2 at DOJ026-32. There is no language in the Petroglyph Act or the LPP which prevents Plaintiffs from developing their property tracts in the same manner they could have prior to the Act. Petroglyph Act, Pub. L. 101-313; Def. Ex. 2. Nor are there any other restrictions or prohibitions imposed by the Federal Government on Plaintiffs' properties. Def. Resp. to Interrog. No. 10.[5]

Plaintiffs' properties are subject to a restrictive covenant in effect since the 1960s which states in relevant part:

> Access roads and utility easements are dedicated and reserved as shown on the Plat[6] of the Subdivision. Electric power and telephone lines will be installed underground. The owner of each lot will be liable for the cost of such installation assessed against such lot by the appropriate utility company, and the assessment shall constitute a lien against the lot until paid.

Def. Mem. Regarding Federal Title Regulations Tabs 3 and 4; Def. Ex. 9 at DOJ151; Tr. (Jan. 28, 2005) at 24-25; Def. Ex. A.[7]

In the mid-1990s, as the NPS began to carry out the land acquisition plan in the LPP, representatives from the NPS expressed concern that the existence of these restrictive covenants might create legal problems for NPS' efforts to acquire these tracts. Def. Ex. A. The concern was a consequence of Attorney General title regulations which prohibit -- in the absence of a waiver -- the Government from acquiring land tracts that are subject to encumbrances like the restrictive covenant running with Plaintiffs' property tracts and the other property tracts in the Monument. Def.

---

[5] See also Def. Resp. to Req. for Adm. No. 6. ("Landowners who are not willing to sell their properties to the United States may remain and improve their properties within the Petroglyph National Monument subject to compliance with applicable state or local laws.")

[6] A "plat" is a map showing actual or planned features such as roads and building lots. Webster's Third New International Dictionary 1734 (2002).

[7] In the Declaration of Restrictions for Volcano Cliffs Unit 2, this restriction is number 13. In the Declaration of Restrictions for Volcano Cliffs Unit 5, this restriction is number 12. The language is the same for each restriction.

Mem. Regarding Federal Title Regulations, Tab 5 (Regulations of the Attorney General issued under Order No. 440-70 (October 2, 1970) at 5(c)).[8]

In response to these concerns, in or around November 1997, Attorney General Janet Reno granted a waiver for "approximately 94 tracts of land located in Volcano Cliffs Subdivision Units 2 and 5. . . ." Def. Ex. A. This waiver covered all of Plaintiffs' tracts as well as the neighboring tracts. See Def. Ex. 2 at DOJ094-096.[9] The issuance of this waiver is memorialized in a letter dated November 10, 1997, from Teresa L. Patrick, Attorney, Land Acquisition Section of the United States Department of Justice to Robert C. Eaton, an attorney in the Office of the Solicitor for the United States Department of the Interior--the department under which the NPS operates. Def. Ex. A.[10]

---

[8] Section 5(c) of the Attorney General's regulations states:

> Other covenants and conditions in the deeds to the United States or in prior deeds may limit the use of the property in a manner which may prevent the sale and disposition of the property under laws relating to the disposition of surplus property so as to prevent the recovery of a substantial portion of the Government's investment in the property. Titles are not acceptable which are subject to such covenants and conditions in the absence of clear authorizing legislation.

Def. Mem. Regarding Title Regulations, Tab 5.

[9] Volcano Cliffs Subdivision Unit 2 includes the Gray Trust Plaintiffs' tract. Def. Ex. 2 at DOJ094. Volcano Cliffs Subdivision Unit 5 includes the Ferrari, Reyes, Lauristen and Taylor Plaintiffs' tracts. Def. Ex. 2 at DOJ095-096.

[10] The letter states in relevant part:

> This is in response to your August 12, 1997, letter on behalf of the National Park Service ("NPS") requesting a waiver of the Attorney General's title regulations governing acquisition of land by the United States for approximately 94 tracts of land located in Volcano Cliffs Subdivision Units 2 and 5 northwest of Albuquerque, New Mexico. These lands are within the authorized boundaries of Petroglyph National Monument, but are subject to restrictive covenants.
>
> Please be advised that the requested waiver has been granted by Assistant Attorney General Lois J. Schiffer . . .
>
> We recommend that you attach copies of the Volcano Cliffs

Pursuant to the terms of the waiver, Defendant agreed to abide by the restrictive covenants running with these tracts. Specifically, the memorandum attached to each letter stated:

> In reference to exception 12, on November 10, 1997, the Assistant Attorney General, Environment and Natural Resources Division, granted a waiver of the Attorney General's title regulations to allow the United States to acquire lots within Volcano Cliffs Unit 5 subject to restrictions listed in the referenced instrument. Please be advised, however, that the restrictions run with the land and will be binding on the United States.

Def. Mem. in Resp. to Pl. Oral Mot. to Compel, Ex. B.[11] The Attorney General's waiver was not disclosed to Plaintiffs until 2005 in the course of this litigation. Tr. at 70-72.[12]

Reflecting the low priority afforded to the acquisition of "priority 4" property tracts, the NPS did not approach Plaintiffs to discuss the acquisition of Plaintiffs' property tracts until late 2000 and early 2001. Pursuant to acquisition procedures in the LPP, the NPS was required to: (1) obtain a preliminary title insurance policy for each property; (2) utilize an independent appraiser to appraise each privately held property; (3) utilize an NPS staff appraiser to review and approve the appraisal; and (4) solicit a written offer from the property owner that is not less than the approved appraisal of the fair market value of the property. Def. Ex. 2 at DOJ074-76.

Defendant had an independent contract appraiser appraise each of the Plaintiffs' property tracts and submitted "Individual Offer[s] to Sell Real Estate" at the appraised value to each of the Plaintiffs.[13] Compl. ¶ 97. Plaintiffs engaged the service of a representative, Rod Kontny, to

---

> restrictions to all opinions of title for these lots. Each opinion should emphasize to the NPS that the restrictions run with the land and will remain binding on the United States.

Def. Ex. A.

[11] The letter to property owners in Subdivision Unit 2 referenced restriction 13 and stated the Government's waiver of this restriction with regard to Unit 2. Otherwise the language remained the same.

[12] Initially, the Government withheld this waiver on grounds of attorney-client privilege. The Government produced the waiver on January 28, 2005. See Def. Reply at 8, n.9; Tr. at 28-29.

[13] Plaintiffs' properties were appraised at the following fair market values:

> Ferrari - $23,000, Def. Ex. 5 at DOJ139;
>
> Reyes - $26,000, Def. Ex. 7 at DOJ143;

accompany the NPS during the appraisals and to represent Plaintiffs in their dealings with the NPS. Defendant communicated its appraisal of the fair market value to Plaintiffs, either directly or through Mr. Kontny, and Plaintiffs, with the exception of Mr. Taylor, believing that the estimates were too low, declined to sell their property tracts for the estimated value. Compl. ¶¶ 75-95, 97. Plaintiff Taylor owned two properties in this section of the Monument and voluntarily sold one of the properties for the Government's appraised value. See Def. Ex. 24, Att. to Aff.[14] There is no evidence that Plaintiffs have unsuccessfully attempted to sell their properties.

In June 1996, Mr. Kontny received an email from Judith Cordova, the Superintendent of the Petroglyph National Monument, stating:

> We have certainly not exercised eminent domain to acquire your land, nor do we expect to do so. One point that particularly needs to be made is that congressional action establishing a National Monument boundary does not constitute acquisition of the land so encompassed. Actual acquisition of the lands within a monument boundary must await congressional appropriations of sufficient funds. Until such time as the NPS does acquire title to your property you are, as always, free to sell, develop, or otherwise use it within the constraints of applicable law. More simply, your property is not actually part of the Petroglyph National Monument until bought and paid for.

Pl. Ex. 1. As of December 2004, the United States had purchased over 4600 acres within the Atrisco Unit where Plaintiffs' properties are located. Def. Ex. 24; Aff't of Glenna F. Vigil (Dec. 4, 2004) ¶ 5.

Plaintiffs filed the instant Complaint alleging Defendant effected an unconstitutional taking of Plaintiffs' property by employing an improper method of land acquisition and including Plaintiffs' properties within the Monument. Plaintiffs contend that the Government acted improperly by interacting with Plaintiffs' representative, Mr. Kontny, generating incomplete or inaccurate appraisals, and offering to purchase Plaintiffs' property tracts for less than Plaintiffs' own estimates of fair market value.

---

Lauristen - $20,000, Def. Ex. 23 at DOJ226;

Gray Trust - $16,000, Def. Ex. 10 at DOJ154;

Taylor - $23,000, Def. Ex. 12 at DOJ158.

[14] The property Mr. Taylor sold is not the subject of this action. See Def. Ex. 12; Def. Ex. 24, Att. to Aff.; Compl. ¶ 18. The property which Mr. Taylor sold, Tract No. 105-17, was part of Volcano Cliffs Subdivision Unit 5. See Def. Ex. 2 at DOJ095.

## Discussion

### Summary Judgment Standard

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). In making a determination as to whether summary judgment is appropriate, a court does not weigh the evidence to determine the truth of the matter, but rather determines whether there is a genuine issue for trial. Id. at 249. The movant bears the initial burden of establishing the absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The non-movant then bears the burden of showing sufficient evidence of a material fact in dispute that would allow a fact finder to decide the case in its favor. Liberty Lobby, 477 U.S. at 256. If such "evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." Liberty Lobby, 477 U.S. at 249-50. When considering the existence of a genuine issue of material fact, a court must draw all inferences in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). When considering cross-motions for summary judgment, the court evaluates each motion under the same standard. Cubic Def. Sys., Inc. v. United States, 45 Fed. Cl. 450, 457 (1999). If genuine disputes exist over material facts, both motions must be denied. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987).

Although the fact-intensive nature of takings claims has caused some courts to find summary judgment to be inappropriate, where a court finds that the material facts have been adequately developed on the record and no genuine issues of material fact exist, summary judgment is appropriate. Compare Moden v. United States, 404 F.3d 1335, 1346 (Fed. Cir. 2005) ("due to the fact-intensive nature of takings cases, summary judgment should not be granted precipitously") and Yuba Goldfields, Inc. v. United States, 723 F.2d 884, 887 (Fed. Cir. 1983) ("The fact-intensive nature of just compensation jurisprudence . . . argues against precipitous grants of summary judgment.") with 767 Third Avenue Associates v. United States, 48 F.3d 1575, 1581 (Fed. Cir. 1995) ("Even though a regulatory taking analysis is normally ad hoc and fact-intensive, the United States may still be entitled to judgment as a matter of law.").

### Alleged Taking

The Tucker Act grants this Court jurisdiction to entertain suits for money against the United States which do not sound in tort and which are founded upon the Constitution. 28 U.S.C. § 1491 (1988). The Takings Clause of the Fifth Amendment of the Constitution prohibits the United States government from taking private property for public use without "just compensation." U.S. CONST. Amend. V.

Plaintiffs have characterized their claim as an inverse condemnation. As the Federal Circuit recognized in Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir. 2005), "[i]nverse condemnation is a 'shorthand description of the manner in which a landowner recovers just

compensation for a taking of his property when condemnation proceedings have not been instituted.'" Id. (quoting United States v. Clarke, 445 U.S. 253, 257 (1980)). Inverse condemnation is "a cause of action against the government to recover the value of property taken by the government without formal exercise of the power of eminent domain." Moden, 404 F.3d at 1342.

Here, as in many inverse condemnation cases, a central issue is whether there has been a taking of private property for the public benefit at all. See Althaus v. United States, 7 Cl. Ct. 688, 693 (1985). Plaintiffs themselves have not articulated a single governmental act which has resulted in a deprivation of their property or its economic use. Instead, Plaintiffs vaguely complain that the Government improperly interacted with their representative in negotiating the potential purchase of their properties, but the record does not substantiate any such interference. Similarly, Plaintiffs accuse the Government of generating incomplete or inaccurate appraisals, but they have proffered no evidence to rebut the Government's independent contract appraisals. Nor did Plaintiffs introduce their own appraisals to show that their land was in fact worth more than the Government offered. Plaintiffs complain that the Government offered too little for their properties, but they made no showing that the independent appraisal the Government obtained was flawed. Finally, Plaintiffs contend that the inclusion of their property within the Monument constitutes a taking, but the uncontroverted evidence establishes that Plaintiffs can continue to use or sell their property without restriction.

A compensable taking of property occurs when society imposes a burden on an individual's property which, in fairness and justice, society itself should bear. Armstrong v. United States, 364 U.S. 40, 49, (1960). A taking may occur both by physical occupation or invasion and by Government regulation of private property. Penn. Coal v. Mahon, 260 U.S. 393, 415 (1922). Plaintiffs assert that their property tracts within the Monument have been constructively taken because pursuant to the LPP, the tracts cannot be developed and because Defendant's offering price for the land is below Plaintiffs' estimation of the market value.[15] In this regard, Plaintiffs apparently attempt to demonstrate a hybrid taking -- not a pure legislative taking and not a pure physical invasion of the land. See generally Drakes Bay Land Co. v. United States, 424 F.2d 574 (Ct. Cl. 1970). In so arguing, Plaintiffs rely heavily on Althaus v. United States, 7 Cl. Ct. 688 (1985).

In Althaus, the Court found this type of hybrid taking where the Government had for nearly ten years continuously and publicly "propounded its intent to acquire the plaintiffs' land by eminent domain," threatened to do so and manifested an interest to buy the land for only one-third of its fair market value. The Althaus Court found as fact that the NPS' superintendent in charge of acquiring lands "sought to compel the landowners to sell the government their lands for 30 percent of their fair

---

[15] Plaintiffs appear to be arguing that the Government cannot legally acquire their lands without exercising eminent domain. To the extent Plaintiffs are challenging the Government's decision not to condemn their property, this Court lacks jurisdiction. See United States v. King, 395 U.S. 1, 3 (1969) (holding that this Court generally lacks jurisdiction to provide equitable or declaratory relief).

market value." 7 Cl. Ct. at 692. Such Government conduct in the words of the Althaus Court "paralyzed" plaintiffs' use of and ability to sell the property and prevented the plaintiffs from developing the property. Althaus, 7 Cl. Ct. at 696-97. There is no evidence of similar egregious government conduct in attempting to compel plaintiffs' to sell their property for a fraction of its value. Nor is there a deprivation of Plaintiffs' ability to use, sell or develop their property as in Althaus. Rather, it appears that there was simply a breakdown in negotiations without Plaintiffs ever obtaining their own appraisals. As this Court has recognized, a failed negotiation between the Government and a property owner is not enough to constitute a taking. B.W. Parkway Associates Ltd. P'ship v. United States, 29 Fed. Cl. 669, 680 (1993), aff'd, 36 F.3d 1116 (Fed. Cir. 1994); see also Caldwell v. United States, 391 F.3d 1226, 1237 (Fed. Cir. 2004) ("Negotiation of a possible future event may state a hope and a plan, but it is not a fixed, ripe, and compensable taking.").

Plaintiffs failed to demonstrate that the Government, through the Petroglyph Act or LPP, prevented them from the full use of their property interest. Palazzalo, 533 U.S. 606, 20-21 (2001). It is well established that merely including a property tract within the boundaries of a national monument does not constitute a constructive taking. Drakes Bay Land Co., 424 F.2d 574; Althaus v. United States, 7 Cl. Ct 688 (1985). There are no provisions in either the Petroglyph Act or the LPP that prevent Plaintiffs from developing their land. Nor is this a case in which Plaintiffs have been denied access to their land. Cf. Drake Bay, 424 F.2d 574 (Government conduct amounted to a taking where the conduct prevented landowner from the possibility of developing land by completely and purposefully depriving landowner of all highway access to his property).

Plaintiffs cannot prove that there was a taking based on the Government's delayed-use or non-use of eminent domain. A complaint based on "the length of time that the Government has been buying, trading for, or condemning theirs and others' lands within the boundaries of [a monument]" is not enough. Hilkovsky v. United States, 504 F.2d 1112, 1115, 205 Ct.Cl. 460 (1974).

Moreover, in order to show a taking, Plaintiffs must show financial loss in order to merit compensation. Cienega Gardens, 331 F.3d at 1340. The financial burden on the plaintiffs must be substantial, and failure to provide evidence of a economic injury is fatal to a takings claim. See Forest Properties, Inc. v. United States, 177 F.3d 1360, 1367 (Fed. Cir. 1999).

Plaintiffs have not demonstrated a financial burden caused by the inclusion of Plaintiff's properties within the Monument. The parties agree that negotiations ended and that Plaintiffs continue to enjoy full access to and use of their land. In order to defeat a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." RCFC 56(e); Liberty Lobby, 477 U.S. at 250; cf. Bank of America of Arizona v. Cities Service Co., 391 U.S. 253, 290 (1968) (holding that the plaintiff could not rely on allegations of a conspiracy in his complaint to defeat summary judgment without "significant probative evidence tending to support the complaint"). Here, Plaintiffs have not provided evidence that the Government's inclusion of their lands within the Monument boundary or purchase offers imposed a financial burden or economic injury. In contrast, Defendant has proffered evidence that it had independent contract

appraisals performed and offered to purchase Plaintiffs' properties for the appraised values. Plaintiffs have provided no specific facts countering this evidence.

Finally, Plaintiffs' two arguments regarding the restrictive covenants do nothing to bolster their claim that a taking has occurred. First, Plaintiffs appear to contend that the Government cannot acquire their properties legally because a regulation of the Attorney General would prevent the Government from acquiring properties subject to a restrictive covenant. However, according to the Government, the Attorney General's waiver cleared the way for the Government to purchase lands subject to these covenants, and it has done so. Second, Plaintiffs speculate that the Government will not abide by the restrictive covenants on the neighboring properties if Plaintiffs decide to develop their lands, thus requiring Plaintiffs to bear the costs of installing underground utility lines for the neighboring tracts. The Attorney General's waiver makes clear that Defendant will be bound by the restrictive covenants on property tracts purchased by Defendant within the Volcano Cliffs subdivision Units 2 and 5, where Plaintiffs' property tracts are located. Def. Ex. A.

## Conclusion

The undisputed facts of record indicate that no compensable taking has occurred. Defendant's motion for summary judgment is **GRANTED**. Plaintiffs' cross-motion for summary judgment is **DENIED**. No costs.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**